KUHN, J.
 

 1 gDefendants-appellants, State of Louisiana through the Department of Health and Hospitals and its secretary Alan Levine (DHH or the department), appeal the trial court’s judgment, granting summary judgment and declaring a reimbursement methodology promulgated by DHH (which appears as rules in various publications of the Louisiana Register) unconstitutional, as well as finding that all DHH’s actions taken pursuant to that reimbursement methodology discriminated in the Medicaid reimbursement payments made to plaintiff-appellee, Vicksburg Healthcare, LLC d/b/a River Region Healthcare System (River Region). Find
 
 *207
 
 ing the record supports a violation of the Commerce Clause of the U.S. Constitution and, as such, a violation of La. R.S. 40:1300.144(A)(S)(b), we amend the judgment and, as amended, affirm.
 
 [1]
 

 BACKGROUND
 

 River Region, who operates a hospital in Vicksburg, Mississippi, and is organized under the laws of the State of Mississippi, filed a petition seeking declaratory relief and damages against DHH, averring that the reimbursement rate DHH was paying to River Region for inpatient healthcare services it administered to Louisiana Medicaid patients was significantly less than the amount DHH reimburses to like instate providers. River Region filed a motion for partial summary judgment on the issue of the legality of the reimbursement methodology. After a hearing, the trial court granted River Region’s motion, declaring the I..¡reimbursement methodology unconstitutional and finding that DHH’s actions applying the methodology discriminated against River Region. DHH appealed the trial court’s judgment, signed in conformity with its ruling.
 
 [2]
 

 SUMMARY JUDGMENT
 

 Summary judgments are reviewed on appeal
 
 de novo,
 
 with the appellate court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate.
 
 Smith v. Our Lady of the Lake Hosp., Inc.,
 
 932512, p. 26 (La.7/5/94), 639 So.2d 730, 750. The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
 

 In light of the undisputed facts, on appeal, the questions presented for our determination are purely legal ones, rather than factual ones, and therefore particularly appropriate for determination by summary judgment “as a matter of law.”
 
 See
 
 La. C.C.P. art. 966(C)(1);
 
 Hays v. Louisiana State Bd. of Elementary and Secondary Educ.,
 
 2009-1386, p. 4 (La.App. 1st Cir.6/11/10), 39 So.3d 818, 820,
 
 writ denied,
 
 2010-1640 (La.10/8/10), 46 So.3d 1272.
 

 DISCUSSION
 

 Medicaid is a joint federal-state program, which furnishes medical assistance on behalf of families with dependent children and other qualifying | individuals,
 
 see
 
 42 U.S.C.A. § 1396, in which Louisiana participates.
 
 [3]
 
 According to La. R.S. 40:1300.144(A)(3)(a), which is part of the Louisiana Rural Hospital Preservation Act
 
 [4]
 
 (RHPA):
 

 With respect to reimbursement for services furnished in another state, the department shall insure that reimbursement for such services shall be the lesser of the payment for such services by
 
 *208
 
 the state wherein such hospital is located or the department’s payment made to like in-state providers.
 
 The department shall provide coverage for such services to the same extent that it would pay for semces furnished within the boundaries of this state,
 
 only
 
 if
 
 any of the following conditions is met:
 

 (i) Medical services are needed because of a medical emergency.
 

 (ii) Medical services are needed and the recipient’s health would be endangered if he were required to travel to his state or residence.
 

 (iii) The state determines, on the basis of medical advice, that the needed medical services are necessary supplementary resources, and more readily available in the other state.
 

 (iv)
 
 It is general practice for recipients in a particular locality to use medical resources in another state.
 
 (Emphasis added.)
 

 Cf
 
 42 C.F.R. § 431.52(b).
 

 By La. Acts 1999, No. 1068, § 1, the Louisiana legislature, among other things, amended and reenacted La. R.S. 40:1300.144(A)(3)(b). These relevant provisions state:
 

 The department shall adopt rules and regulations in accordance with the Administrative Procedure Act that provide the following ...
 

 In the event federal requirements for the state plan for medical assistance permit the department to impose further restrictions on payment for and coverage of medical services to Louisiana Medicaid patients rendered by out-of-state providers, the department shall promulgate regulations restricting payment for and coverage of such | ¿services
 
 to the fullest extent pemiitted by law. Such restrictions shall include lowering the rate of reimbursement provided for services rendered to out-of-state hospitals to the payment for such semces by the state wherein such hospital is located, the department’s payment made to like in-state providers, or the average rate paid to Louisiana rural hospitals located in the state, whichever is the least.
 
 (Emphasis added.)
 

 In an attempt to conform to the directive stated in La. R.S. 40:1300.144(A)(3)(b), DHH adopted a rule (the DHH Rule),
 
 [5]
 
 which created a classification of out-of-state, “border” hospitals.
 
 [6]
 
 As it appears in its final enactment, the DHH Rule states:
 

 Out-of-state hospitals that provided at least 500 inpatient hospital days in State Fiscal Year 1999 and are located in border cities (cities located within a 50 mile trade area of the Louisiana state border) will continue to be reimbursed at the lesser of each hospital’s actual cost per
 
 *209
 
 day (based on the 1998 filed cost report) or the Medicaid per diem rate of the state wherein the services are provided. This reimbursement methodology is applicable for all Louisiana Medicaid recipients who receive inpatient services in an out-of-state hospital located in a border city, including those recipients up to the age of 21.
 

 The following facts are undisputed. River Region was enrolled in the Louisiana Medicaid program from March 8, 2000 until November 30, 2008, when it withdrew its participation in the voluntary administration of healthcare services to Louisiana Medicaid patients. From March 8, 2000 through September 1, 2008, River Region provided a total of 13,284 inpatient hospital healthcare services to | (Louisiana Medicaid patients. Under the DHH Rule, border hospitals are reimbursed differently than Louisiana hospitals that provide inpatient hospital services to Louisiana Medicaid patients.
 
 [7]
 
 River Region is classified as a border hospital. Under its tiered system, DHH’s classification of “Peer Group 5” refers to a category of hospitals, which have more than 138 beds and are neither rural hospitals nor teaching hospitals. River Region is an out-of-state hospital where Louisiana Medicaid patients customarily obtain medical services.
 
 [8]
 
 It has more than 138 beds and is neither a rural hospital nor a teaching hospital.
 
 [9]
 
 At all times since March 8, 2000, DHH has reimbursed River Region a lower per diem rate for inpatient hospital healthcare services it administered to Louisiana Medicaid Lpatients than the amount in-state Peer Group 5 hospitals have been reimbursed for their administration of inpatient hospital healthcare services.
 
 [10]
 

 
 *210
 
 River Region asserts, among other things, that DHH’s reimbursement methodology for inpatient hospital healthcare services administered to Louisiana Medicaid patients by border hospitals violates the Commerce Clause of the U.S. Constitution. Specifically, it asserts that the DHH Rule directly discriminates against and places excessive burdens on interstate commerce without serving any valid state interest other than protectionism toward its in-state hospitals, particularly rural hospitals. As such, River Region maintains, the DHH rule is not in conformity with La. R.S. 40:1300.144(A)(8)(b) in that it does not restrict payment for and coverage of such services to the fullest extent permitted by law.
 

 The Commerce Clause provides that “Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States....” U.S. Const, art. 1, § 8. On its face, the Commerce Clause simply empowers Congress to regulate interstate commerce. This clause, however, historically has been construed as not only empowering Congress, but also limiting the states.
 
 Crescent Towing & Salvage Co., Inc. v. Ormet Corp.,
 
 1997-1531, p. 5 (La.9/9/98) 720 So.2d 628, 631,
 
 cert. denied, 525
 
 U.S. 1142, 119 S.Ct. 1035, 143 L.Ed.2d 43 (1999) (citing
 
 Cooley v. Bd. of Wardens,
 
 53 U.S. 299, 12 How. 299, 13 L.Ed. 996 (1852);
 
 see generally
 
 Laurence H. Tribe, American Constitutional Law §§ 6.3-6.4 (2d Red.1988)). The latter limiting aspect is referred to as the dormant Commerce Clause.
 
 Crescent Towing & Salvage Co., Inc.,
 
 1997-1531 at p. 5, 720 So.2d at 631.
 

 Under the dormant Commerce Clause, there is a “virtually per se rule of invalidity” applicable to state regulations that directly discriminate against interstate commerce — i.e., favor in-state over out-of-state economic interests.
 
 Id.,
 
 1997-1531 at pp. 5-6, 720 So.2d at 631 (citing
 
 City of Philadelphia v. New Jersey,
 
 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), and noting a New Jersey law that barred local landfills from importing out-of-state wastes was struck down by the court). The dormant Commerce Clause also invalidates state regulations that indirectly discriminate if the regulation imposes an undue burden on interstate commerce.
 
 Crescent Towing & Salvage Co., Inc.,
 
 1997-1531 at p. 6, 720 So.2d at 631 (citing
 
 Hughes v. Oklahoma,
 
 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)).
 

 DHH initially urges that it is a market participant and, as such, the dormant Commerce Clause is inapplicable to its promulgation of the DHH Rule. In support of this contention, DHH suggests that when a state participating in the federal Medicaid program decides the amount it is willing to reimburse a healthcare provider for administering healthcare services to the state’s Medicaid patients, and then makes payments accordingly, that state is entering into the healthcare services market and participating in it as a purchaser.
 

 Our Louisiana Supreme Court, examining the jurisprudence of the U.S. Supreme Court and other scholarly sources, stated in
 
 Crescent Towing & Salvage Co., Inc.,
 
 1997-1531 at pp. 6-7, 720 So.2d at 631-32:
 

 ^Historically, the Commerce Clause has been utilized principally in cases in
 
 *211
 
 volving state taxes and regulatory measures “impeding free private trade in the national market place.”
 
 Reeves, Inc. v. Stake,
 
 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); Tribe,
 
 supra,
 
 [§§ ] 6-11, p. 431. The Court, in focusing on cases of Commerce Clause violations by state or municipal action in enacting statutes or ordinances, developed an exception when the action by the government is as a market participant, akin to a private party, as opposed to a market regulator.
 
 See Hughes v. Alexandria Scrap Corp.,
 
 426 U.S. 794, 822 n. 4, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976)(Brennan, J., dissenting). Explaining this exception, the Court has stated:
 

 There is no indication [in the Commerce Clause] of a constitutional plan to limit the ability of the States themselves to operate freely in the free market.... Restraint in this area is also counseled by considerations of state sovereignty ... and “the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.” Moreover, state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants. Evenhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause.
 

 Reeves,
 
 447 U.S. at 436-38, 100 S.Ct. 2271, 65 L.Ed.2d 244. Stated otherwise, “[w]hen a state government regulates or taxes, it turns over nothing that belongs to it; rather, it compels private action through the exercise of raw governmental power. In contrast, when a state government buys or sells, it is controlling and distributing its own resources.” Dan T. Coenen,
 
 Untangling the Market-Participant Exemption to the Dormant Commerce Clause,
 
 88 Mich. L.Rev. 395, 422 (1989).
 

 DHH’s role in its participation in the federal Medicaid program can only be described as a hybrid one.
 
 See Smith v. Dep’t of Agric. of the State of Georgia,
 
 630 F.2d 1081, 1083 (5th Cir.1980),
 
 cert. denied,
 
 452 U.S. 910, 101 S.Ct. 3040, 69 L.Ed.2d 412 (1981). The market is a result of the decision of the State of Louisiana to participate in the federal Medicaid program. It is operated and Impartially financed by the State of Louisiana.
 
 [11]
 
 But it is significant that DHH neither operates the small rural hospitals it seeks to protect and that provide the healthcare services to Louisiana Medicaid patients nor engages in the actual buying and selling of those healthcare services. The record clearly establishes that the Louisiana Medicaid patient is permitted to request healthcare at any facility that is a qualified Medicare provider of his choosing. Regardless of the facility the Louisiana Medicaid patient chooses, the patient pays nothing. Therefore, the calculation of the flat fee rate that River Region is reimbursed by DHH is not dependent on any contribution from the patient, the actual recipient of the healthcare services administered by River Region. In essence, the State of Louisiana has simply provided a suitable marketplace for the administration of healthcare services to Louisiana Medicare patients. Thus, the State of Louisiana cannot be deemed an actual market participant by its
 
 *212
 
 participation in the federal Medicaid program.
 
 Id.
 
 The State of Louisiana’s essential role is that of market regulator, and the DHH Rule as applied to River Region is subject to scrutiny under the Commerce Clause.
 
 Id.
 

 Having determined that this case involves the kind of activity to which the Commerce Clause applies, it is necessary to determine whether the regulation at issue imposes an impermissible burden on interstate commerce.
 
 Id.,
 
 630 F.2d at 1084. Therefore, we must inquire (1) whether the challenged statute regulates evenhandedly with only “incidental” effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether | n alternative means could promote this local purpose as well without discriminating against interstate commerce.
 
 Id.; Crescent Towing & Salvage Co., Inc.,
 
 1997-1531 at p. 6, 720 So.2d at 631 (citing
 
 Hughes,
 
 441 U.S. at 336, 99 S.Ct. 1727, 60 L.Ed.2d 250).
 

 It is undisputed that River Region’s reimbursement rate for its administration of inpatient healthcare services to Louisiana Medicaid recipients is lower than the reimbursement rate than in-state hospitals DHH classifies as “Peer Group 5” hospitals. The evidence also established that aside from its administration of healthcare in the State of Mississippi, River Region possessed the same characteristics as a “Peer Group 5” hospital, i.e., it has more than 138 beds and is neither a rural hospital nor a teaching hospital. As such, River Region has established that the DHH reimbursement methodology as applied to River Region favors in-state over out-of-state economic interests. Thus, DHH must demonstrate the DHH Rule serves a legitimate purpose and that this purpose could not be served as well by available nondiscriminatory means.
 

 DHH contends that the purpose of the DHH Rule setting forth the reimbursement methodology as directed by the legislature in its enactment of La. R.S. 40:1300.144(A)(3)(b) is that expressed in § 1300.142(B) of the RHPA:
 

 The legislature hereby declares that, absent the enactment of the following provisions, the very existence of Louisiana’s small rural hospital [system] is imperiled. The legislature hereby declares that the purpose of this Part is to assure the continued viability of rural hospitals.
 

 DHH maintains this purpose is legitimate because it optimizes the allocation of Louisiana’s limited Medicaid budget in such a way as to enhance the viability of the State’s small rural hospitals and, thus, enhance the health of the residents | i2they serve. As such, DHH asserts, Louisiana has a legitimate interest in ensuring the adequate funding of the network of healthcare providers that serves its residents. The deposition testimony seemingly supports this assertion. DHH representative, Jerry Phillips, who is the Director of the Bureau of Health Services Financing, indicated that reimbursing River Region at a higher rate did not mean that the reimbursement rate for rural hospitals would be less, but pointed out that the volume of business could be affected. DHH representative, Sandra Victor, also indicated that the promulgation of the DHH Rule, in accordance with the legislative directive of La. R.S. 40:1300.144(A)(3)(b), was to make sure that rural hospitals were not adversely impacted by border hospitals. Thus, DHH suggests that “only the most important hospitals — that is, the hospitals located in Louisiana, and particularly the endangered small rural hospitals which the RHPA seeks to help and protect — can be
 
 *213
 
 prioritized for funding purposes.” But the record is devoid of any measures taken by DHH to determine that “the most important” hospitals for all Louisiana Medicaid patients are those located in Louisiana and particularly the small rural hospitals. Likewise, DHH has offered nothing to show that its objective of preserving small rural hospitals cannot be accomplished by nondiseriminatory alternatives.
 

 Despite the suggestion that the application of the DHH Rule to River Region’s reimbursement rate for inpatient healthcare services it administered to Louisiana Medicaid patients is for the purpose of assuring continued viability of rural hospitals, it is basically a protectionist measure.
 
 See City of Philadelphia,
 
 437 U.S. at 623-24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475. Indeed, there is obviously no reason to differentiate between in-state Peer Group 5 hospitals and River Region on any | i.gbasis other than the physical location of the hospitals. This is particularly egregious when the Louisiana Medicaid patient has chosen to avail himself of River Region’s services, which may be more extensive, or more convenient, than anything locally available to him.
 
 See Smith,
 
 630 F.2d at 1084-85.
 

 We note, however, that the trial court’s declaration was that the DHH Rule was unconstitutional, without any restrictions, i.e., ostensibly unconstitutional on its face. But this record is insufficient to establish that the other border hospitals subject to the reimbursement methodology set forth in the DHH Rule (i.e., Natchez Regional Medical Center and Natchez Community Hospital) are also discriminated against in DHH’s application to their respective reimbursement rates. Documentation shows that each of these hospitals receives significantly more than River Region.
 
 [12]
 
 As such, the trial court’s judgment declaring the DHH Rule unconstitutional is too broad and is amended to limit the declaration of unconstitutionality to the application of the reimbursement methodology to River Region. And because the DHH rule is unconstitutional, it is not in conformity with La. R.S. 40:1300.144(A)(3)(b) in that it is not a regulation restricting payment for and coverage of such services “to the fullest extent permitted by law.”
 

 luDECREE
 

 For these reasons, the trial court’s judgment is amended to state:
 

 IT IS ORDERED, ADJUDGED, AND DECREED that plaintiffs motion for partial summary judgment is GRANTED and declare that the Louisiana Department of Health and Hospitals’ reimbursement rules, which appear at 26 La. Reg. 217 (February 20, 2000); 26 La. Reg. 1234 (June 20, 2000); 26 La. Reg.1954-1955 (September 20, 2000); 26 La. Reg. 2795 (December 20, 2000); and the second paragraph of 29 La. Reg. 2801-2802 (December 20, 2003) are held to be unconstitutional as applied by Louisiana Department of Health and Hospitals to plaintiff, Vicksburg Healthcare, LLC d/b/a River Region Healthcare System and, as such, is in violation of La. R.S. 40:1300.144(A)(3)(b) insofar as applied by Louisiana Department of
 
 *214
 
 Health and Hospitals to plaintiff, Vicksburg Healthcare, LLC d/b/a River Region Healthcare System.
 

 In all other respects, the judgment is affirmed.
 
 [13]
 
 Appeal costs in the amount of $2,245.50 are assessed against defendants-appellants, State of Louisiana through the Department of Health and Hospitals and its secretary, Alan Levine.
 

 AMENDED AND, AS AMENDED, AFFIRMED.
 

 [1]
 

 . Rules and regulations promulgated by an administrative body are not "a law or ordinance” under La. Const. Art. V, sec. 5(D) so as to warrant a direct appeal to the Louisiana Supreme Court upon a trial court's declaration that they are unconstitutional.
 
 See Holthus v. Louisiana State Racing Comm'n,
 
 569 So.2d 547 (La.1990); and
 
 Benelli v. City of New Orleans,
 
 474 So.2d 1293, 1294 (La.1985).
 

 [2]
 

 . Although the issue of what amount of damages River Region may be entitled to receive remains unresolved, the trial court correctly certified the judgment as final.
 
 See
 
 La. C.C.P. art. 1915 B;
 
 Motorola, Inc. v. Associated Indent. Corp.,
 
 2002-1351, pp. 16-17 (La.App. 1st Cir.10/22/03), 867 So.2d 723, 732-33.
 

 [3]
 

 . Louisiana’s Medicaid program is administered by the Bureau of Health Services Financing, an agency within DHH.
 

 [4]
 

 .
 
 See
 
 La. R.S. 40:1300.141-1300.146.
 

 [5]
 

 . Although River Region included in its challenge an assertion that La. R.S. 40:1300.144(A)(3) was unconstitutional, the trial court found to the contrary, and River Region did not appeal that determination. Thus, the sole scope of our review is directed at the constitutionality of the regulations enacted by DHH under its authority set forth in La. R.S. 40:1300.144(A)(3)(b).
 

 [6]
 

 . See 26 La. Reg. 217 (February 20, 2000); 26 La. Reg. 1234 (June 20, 2000); 26 La. Reg. 1954-1955 (September 20, 2000); 26 La. Reg. 2795 (December 20, 2000); and the second paragraph of 29 La. Reg. 2801-2802 (December 20, 2003). According to DHH representative, Sandra Victor, in response to the 1999 amendment to La. R.S. 40:1300.144(A)(3)(b), an emergency rule was initially published in the Louisiana Register in February 2000, re-declared twice, and became final in the Louisiana Register in December 2000. In December 2003, another section was added to that same rule in addition to republication in the second paragraph of the DHH Rule creating border hospitals and the method of reimbursement applicable to them.
 

 [7]
 

 . DHH representative, Debra Gough, testified that in determining the amounts of reimbursement in-state hospitals receive for administering healthcare inpatient hospital services to Louisiana Medicaid patients, DHH uses a cost report determination from the early 1990’s, either 1991 or 1993. But she explained that the legislature annually appropriates rate increases, noting that the last increase was in 2007 for a 4% upward adjustment. In applying the DHH Rule, Gough advised that out-of-state hospitals were receiving “the Medicaid per diem rate of the state wherein the services are provided,” i.e., Mississippi’s rate for River Region. But in applying the DHH Rule, DHH calculated the amount of Mississippi’s Medicaid per diem rate from either 1995 or 1996. The Louisiana legislature has made no appropriations for rate increases to the out-of-state providers.
 

 [8]
 

 . According to 42 C.F.R. § 431.52(b)(4), which applies to the state plans of all states participating in the federal Medicaid program:
 

 A State plan must provide that the State will pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries if the services are furnished to a recipient who is a resident of the State, and. the following condition [ ] is met ... [i]t is general practice for recipients in a particular locality to use medical resources in another State.
 

 See and compare
 
 La. R.S. 40:1300.144(A)(3)(a)(iv).
 

 [9]
 

 . Although the record does not contain direct evidence of the number of beds River Region has, documentation admitted into evidence shows that in calculating the financial impact that proposed legislation (La. HB 1183 of the Regular Session of 2008) equalizing the per diem reimbursement payments between instate and out-of-state hospitals who administer healthcare services to Louisiana Medicaid patients, the underlying documentation provided to the Legislative Fiscal Office by DHH indicated that River Region was classified at the reimbursement per diem rate for a Peer Group 5 hospital. Additionally, in her deposition testimony, Gough stated that she understood that River Region was a hospital that had over 150 beds and that it was not a teaching hospital. And by definition, River Region is not a rural hospital.
 
 See
 
 La. R.S. 40:1300.143(7)(a).
 

 [10]
 

 . The evidence established that between March 2000 and July 2009, the per diem
 
 *210
 
 reimbursement rate paid to hospitals located within Louisiana who administered healthcare services to Louisiana Medicaid patients that DHH categorized as Peer Group 5 hospitals ranged from $841.70 per day (in 2000) to $999.92 (commencing in September 2007). Contemporaneously, River Region received for its healthcare services to Louisiana Medicaid patients a per diem reimbursement rate that ranged from $496.70 (in 2000) to $525.65 (commencing in July 2000).
 

 [11]
 

 . Through Gough’s testimony, the evidence established that the State pays from its general fund a little less than half the amount it reimburses qualified providers and that the federal government pays the remainder.
 

 [12]
 

 . The documentary evidence establishes that the current per diem rate for Natchez Regional Medical Center on May 1, 2008 was $896.65; and for Natchez Community Hospital, it was $680.05 without an articulation of the bases for the calculation of those per diem rates. Specifically, the record is devoid of evidence of which “like in-state providers” to which these hospitals are comparable.
 

 [13]
 

 . Although River Region also asserted that the DHH Rule was illegal because it fails to comply with the Medicaid Act, 42 C.F.R. § 431.52 in particular, see n. 8, the record is insufficient to support such a finding. While we agree that DHH’s interpretation of § 431.52(b)(4) is strained at best, River Region failed to explain approval by the Centers for Medicare/Medicaid Services of the State of Louisiana’s state plan, which the evidence established included the substance of the DHH Rule. As such, summary judgment could not be granted on that basis. Moreover, having found that, as applied to River Region the DHH Rule is in violation of La. R.S. 40:1300.144(A)(3)(b) sufficient to support the trial court’s grant of summary judgment, we find it unnecessary to address this assertion and pretermit such a discussion. River Region also contended that the DHH Rule failed to comply with La. R.S. 40:1300.144(A)(3)(b) because the DHH Rule did not restrict payment and coverage "to the fullest extent permitted by law,” and pointed to the alleged violation of the Medicaid Act. But as we have indicated, River Region failed to provide sufficient evidence to support a finding that the DHH Rule was not in conformity with the Medicaid Act. Therefore, that assertion is also without merit. The trial court’s judgment declared the DHH Rule as set forth in various rules in the Louisiana Register unconstitutional "because they violate the Equal Protection Clauses of the U.S. and Louisiana Constitutions.” Since we have found the application of the DHH reimbursement methodology is a violation of La. R.S. 40:1300.144(A)(3)(b) because it is unconstitutional as applied to River Region inasmuch as it is a violation of the Commerce Clause, we find it unnecessary to review the propriety of the trial court's conclusion insofar as equal protection violations. In so concluding, we note the same dearth of evidence about the bases for the calculation of the other border hospitals to which the DHH Rule is applied, see n. 12, and, therefore, an affirmance on a determination of equal protection violations would likewise result in amendment of the broad declaration of unconstitutionality stated in the trial court’s judgment. More importantly, similarly to the court in
 
 West Virginia University Hospitals, Inc. v. Casey,
 
 885 F.2d 11, 30 n. 9 (3d. Cir.1989), we have reservations about the equal protection rights conclusion reached by the trial court. Accordingly, we pretermit a discussion of the alleged equal protection violations of the DHH Rule as applied to River Region.